TEXAS & P. RY. CO. v. MYERS et ux.

(Court of Civil Appeals of Texas. Texarkana. Oct. 29, 1912. Rehearing Denied Nov. 7, 1912.)

1. LIMITATION OF ACTIONS (§ 127*) — COMMENCEMENT OF ACTION — AMENDMENT OF PLEADINGS.

A railway employé who had been riding on a hand car was struck and killed by a train while attempting to cross the track to a place of safety after ineffectually attempting to remove the hand car from the track. The original complaint alleged as a cause of action the negligence of his foreman in compelling the crew to stay with the hand car too long. After a cause of action for his death would have been barred by limitations, except for the commencement of the action, the petition was amended to allege negligence on the part of the engineer of the train. Held, that the amendment did not introduce a new cause of action against which limitations had run.

[Ed. Note.—For other cases, see Limitation of Actions, Cent. Dig. §§ 543–547; Dec. Dig. § 127.*]

2. MASTER AND SERVANT (§ 286*) — ACTIONS FOR INJURIES—EVIDENCE—SUFFICIENCY.

In an action for the death of a railway employé who was struck by a train while attempting to cross the track to a position of safety after attempting to remove a hand car from the track, evidence held to present a question for the jury as to the negligence of the engineer of the train and to support its verdict.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 1001, 1006, 1008, 1010–1015, 1017–1033, 1036–1042, 1044, 1046–1050; Dec. Dig. § 286.*]

Appeal from District Court, Harrison County; H. T. Lyttleton, Judge.

Action by W. L. Myers and wife against the Texas & Pacific Railway Company. Judgment for plaintiffs, and defendant appeals. Affirmed.

See, also, 125 S. W. 49; 134 S. W. 814.

On the. afternoon of April 9, 1908, Charley Myers was struck and instantly killed by one of the appellant's freight locomotives. He was a member. of a regular bridge gang in the service of the appellant that were working on the bridges north of Woodlawn. At 4:30 in the afternoon, which was the usual hour to stop work, the bridge gang loaded their tools on a hand car furnished by the company for the purpose of transporting the tools,. and started south to the town of Wood-lawn. The regular boarding car of the bridge crew was stationed at Woodlawn, about three miles distant from the. bridge they were working upon. While the bridge crew were proceeding from their work to Woodlawn on the hand car, the bridge foreman, who was on the lookout, discovered a freight train approaching from the north. It was proven that the operatives of the freight train saw the bridge crew on the hand car about the same time that the bridge foreman saw the freight train. The hand car at the. time of the discovery of the approaching train was at a point about the middle or towards the south end of a narrow cut, and this is the point at which. the operatives of the train saw the hand car. The cut was about 300 yards long, of narrow width; and the banks on. each side were perpendicular and about 10 feet high. From the point of location of the hand car towards the south the track was straight, but upgrade. The bridge foreman testified that, when he first saw the approaching train, it was about 250 yards, or about 3 or 4 telegraph poles, distant. A member of the bridge crew testified that the train was about a quarter of a mile distant from the hand car. The engineer of the freight train testified that the hand car and crew were inside and towards the south part of the cut when he first saw them, and his locomotive was about 700 yards distant from the hand car at the time. The fireman on the locomotive gives the same distance as the engineer. Upon discovering the approaching train, the foreman immediately ordered the hand car stopped, and ordered the men to their places to assist in removing the car from the track. In compliance with the command of the foreman, the bridge crew endeavored to remove the hand car from the track, and lifted at it until one of the employés dropped his end of the car and ran away. The car was gotten off the track except for one wheel, which hung to the rail. The employés then scattered away from the hand car, and Myers ran north on the right-hand or east side of the track, being the

same side on which the hand car was being lifted, and being the outside of a curve. After running a few feet, Myers attempted to cross the track to the other side, where the other members of the crew were, so as to be out of the way of the hand car, which was sure to be struck by the approaching train. It was dangerous to be near the hand car in the collision, because it was loaded with tools such as axes and the like. Just as he had crossed the rails to the ties on the west side of the track he was struck by the pilot beam of the engine, and instantly killed. The operatives of the freight locomotive admit that Myers and his crew were all the time in a perilous situation and place from the approaching train because it was in a narrow and deep cut and the hand car was on the track. These operatives further say that they saw and knew the perilous situation to the crew from the time of their first seeing the crew. The engineer testified that during all the time to the injury there was only once or twice, and then for a few seconds only, when some one of the bridge crew was not on the track with the hand car. According to the testimony of the engineer, there were 25 cars in the train, and at the time he first saw the bridge crew the engine was running at a speed of not less than 25 miles an hour or more than 28 miles an hour; that the time card limit was 18 miles an hour, but that the officers of the company had authorized him to run the train as fast as he thought it was safe; that as soon as he saw the bridge crew he applied the emergency brakes, and caused the whistle to be sounded and the bell to be rung. He said it was not possible to stop the train in the distance to be run, but that he slackened the speed down to between 12 and 15 miles per hour, and that this was the rate of speed of the train at the time of the injury. The fireman testified substantially as did the engineer about what was done to stop the train, except that the fireman testified that he did not see the engineer try to put sand on the rails in front of the wheels. Both the fireman and the engineer say that, after the deceased was struck, the train was stopped within five or six car lengths distance, and that at the time it struck deceased it was running between 12 and 15 miles per hour. The foreman of the bridge gang testified that the rate of speed of the train when it was first discovered by him was about 20 miles, and that it was running at the same rate of speed when it struck deceased. At the time of his death deceased was 20 years and 2 months old, and unmarried, and was earning about $60 per month. His father and mother claim damages for loss of services during his minority and of expected pecuniary benefits after attaining his majority. The alleged grounds for negligence are (1) in the bridge foreman in ordering the members of his crew to remove the hand car from the track and in keeping them too long at work in the ef-

fort to remove the car from the track; and (2) in the operation of the locomotive after the operatives saw the perilous situation of the bridge gang. The court submitted only the second ground of alleged negligence to the jury, and confined a recovery to plaintiffs on that ground.

We conclude that the operatives of the freight train were guilty of negligence as pleaded, proximately causing the death of deceased; and the verdict of the jury in this respect is sustained.

F. H. Prendergast, of Marshall, for appellant. S. P. Jones, of Marshall, for appellees.

LEVY, J. (after stating the facts as above) The several assignments mainly present the two points as argued by appellant in its brief: (1) That the cause of action upon which recovery was had was barred by limitation; and (2) that there was no act of negligence shown on the part of the engineer and fireman to support the judgment.

[1] The precise contention as to the first point made is that the claim growing out of the negligence of the engineer of the freight train was barred by limitation because it was not set up until the filing of the second amended petition in June, 1910, more than two years after the death of Myers. The first petition was filed about a month after the death of deceased. This petition set up the fact that the deceased was struck and killed by a freight locomotive, and the circumstances under which it occurred; and charged the negligence to be in the foreman of the bridge crew in compelling the crew to stay with the hand car till the last to get it out of the way of the approaching freight train. The amended petition in 1910 charged substantially the same facts, reasserting the negligence of the bridge foreman, and also asserting the negligence of the engineer of the freight train in failing to discover Myers in time, or, having discovered him, in failing to stop his engine before it struck Myers. We do not think that the amended petition, upon which the case was tried, introduced a new cause of action against which limitation had run. Caswell v. Hopson, 47 S. W. 54, and authorities there cited.

[2] There was sufficient evidence, we think, to raise the issue of negligence on the part of the operatives of the locomotive proximately causing the death of Myers requiring its submission to the jury, and sufficient to support their findings. Myers v. Railway Co., 134 S. W. 814 (on former appeal). The assignments presenting these two questions, being Nos. 1, 2, 3, 4, 7, 12, 14, and 15, are therefore overruled.

Assignments Nos. 8, 9, 10, and 13 are without injury, and are overruled.

The eleventh and sixteenth assignments are to the point that the judgment is excessive. Besides other things, it was shown that the deceased was young, strong, and

healthy, and was earning money, and that his father was 51 years old. Under the language of the statute, broad authority is given the jury to measure the pecuniary injury in this character of cases. There is nothing in the record or the size of the verdict to suggest any passion or prejudice on the part of the jury. The assignments are overruled.

It is unnecessary, we think, to discuss appellees' cross-assignments. They are overruled.

The judgment is ordered affirmed.